UNITED STATES of America,
Plaintiff–Appellee,

v.

Melvin J. REYNOLDS, Defendant–
Appellant.

No. 97–2933.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1999.

Decided Aug. 27, 1999.

Rehearing Denied Sept. 30, 1999.

Ted Chung (argued), Office of U.S. Attorney, Criminal Division, Chicago IL, for plaintiff–appellee.

Richard S. Kling (argued), Chicago–Kent College of Law, Chicago, IL, for defendant–appellant.

Before POSNER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

MANION, Circuit Judge.

Former Congressman Melvin C. Reynolds was born into a poor family in Mississippi, moved to Chicago when he was nine years old, went on to attend Yale University, graduated from the University of Illi-

nois, and won a Rhodes Scholarship to attend the University of Oxford. Later on he received a degree from Harvard. Reynolds also ran for and was eventually elected to Congress. During his campaigns in 1988, 1990, and 1992, Reynolds solicited illegal campaign contributions and violated various federal election laws. After he was elected, Reynolds initiated a fraudulent real estate transaction and obtained personal loans from banks through fraudulent misrepresentations. During the same period, Reynolds began having sex with an underage campaign worker. Eventually, Illinois successfully prosecuted Reynolds for criminal sexual abuse, obstruction of justice and solicitation of child pornography. Subsequently, a federal grand jury indicted Reynolds for bank fraud and federal election law violations, and for obstruction of justice in connection with these crimes. A jury convicted Reynolds on 15 of the 16 counts in the federal indictment and the district court sentenced him to a 78–month prison term, and five years supervised release. Reynolds now appeals his federal convictions and sentence.

## I.

Reynolds' election fraud involved a scheme to launder money donated to his campaign from a union. Under federal election law, a labor union may not contribute funds to a federal candidate. 2 U.S.C. § 441b. Unions are free, however, to set up political action committees ("PACs") for the purpose of contributing funds to candidates. But federal candidates may only accept union PAC money if the PAC is funded exclusively with voluntary donations from union members. *See Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972). Union PACs funded with mandatory dues are prohibited from contributing to a federal campaign.

Reynolds devised a plan to circumvent this law. He set up and controlled the 9th Ward Independent Democratic Organiza-

tion ("WIDO"), the 17th WIDO, and the 21st WIDO. Reynolds then solicited the Hotel Employees and Restaurant Employees International Union ("HEREIU") and its PAC funded by mandatory union dues to contribute money to these Ward Organizations. HEREIU contributed $85,000 of mandatory dues to the Ward Organizations through this PAC. Reynolds then used the $85,000 to fund his congressional campaigns, without disclosing to the Federal Election Commission that these funds originated from a union.

Reynolds accomplished these money transfers through the use of employees who acted as front people for these so-called ward organizations. For example, Joseph Barton was a part-time congressional employee on Reynolds' staff in Chicago when Reynolds approached him and asked him to set up a PAC. Barton and Reynolds agreed that the name should be "17th Ward Independent Democratic Organization." Reynolds directed Barton to list another person, Willie Tines, as president of the 17th WIDO. Tines had no knowledge of this, and when he discovered that he had been listed as president of this organization, he demanded that he be removed. At Reynolds' behest, Barton set up a bank account for the 17th WIDO, and Reynolds began giving checks from the HEREIU to Barton to be deposited. All the money put into this PAC, over $50,000, was from the hotel union, except for a check for $5000 which came from Reynolds' own funds. Barton estimated that about 80 percent of the money paid into his PAC then was spent on Reynolds' campaign expenses. These expenses included setting up a phone bank, putting up campaign posters and advertising. Moreover, Reynolds directed Barton to wire money to employees of the campaign, and also to Reynolds himself. Barton also drew substantial cash from the PAC account which went to pay campaign expenses. Furthermore, Barton testified that all of this was done at Reynolds' direction.

James Matz testified that he fulfilled a similar role with respect to the 9th WIDO. He deposited checks from HEREIU, and then used those funds for Reynolds' campaign purposes. He also testified that Reynolds forged his signature on several checks drawn on the 9th WIDO bank accounts. Similarly, Tines testified that he cashed a check from the HEREIU made payable to the 21st WIDO and delivered the proceeds from the check to Reynolds.

The bank fraud took place after Reynolds was elected to Congress in 1992. Reynolds sought a home mortgage from various federally insured banks, including Riverdale Bank, Ashland Bank, Beverly Bank, and Countrywide Funding, in the amount of $279,000. In applying for these loans, Reynolds misrepresented his financial condition. Reynolds' application to Riverdale Bank listed debts in the amount of $73,500; however, at the time, Reynolds owed $284,397. The day after Reynolds represented to Riverdale that he had $73,-500 in debts, he represented to the Beverly Bank that he had $96,000 in debts, still far short of his actual debt. Almost three weeks later, Reynolds represented to Countrywide Funding that his liabilities were $53,500, although at the time they were in fact $304,390. Countrywide preliminarily approved a mortgage loan for Reynolds and asked him to complete an application form, wherein Reynolds listed his liabilities as $59,922, when in fact they were $325,319.

Reynolds also misrepresented the source of his downpayment. He certified to Countrywide that no part of the downpayment on the house had been borrowed.[1]

In fact, the source of the downpayment was funds loaned to Reynolds by campaign workers, and also funds from the 17th WIDO. In connection with these loan applications, Reynolds also forged documents misrepresenting his wife's employment, and the campaign's finances.

On appeal, Reynolds contends that the district court did not require the government to prove the "materiality" of Reynolds' representations relating to bank fraud. He also argues that a jury instruction misstated from whom a federal candidate may receive campaign donations. Additionally, Reynolds raises several arguments regarding the district court's handling of some pretrial motions and of the trial itself. Finally, Reynolds argues that the district court erred in finding that Reynolds led an organization of five or more participants in his conspiracy. None of these arguments have merit, and we affirm Reynolds' conviction and sentence.

**II.**

**A. Materiality**

Count One of the Indictment charged Reynolds with implementing a scheme to defraud four banks by obtaining loans under false and fraudulent pretenses. 18 U.S.C. § 1344. Reynolds asserts that the government must prove that the representations made by Reynolds were material, or in other words, had "a natural tendency to influence, or being capable of influencing, the decision of the decision making body to which it was addressed." *United States v. Pribble*, 127 F.3d 583, 587 (7th Cir.1997).[2] The record does not bear

---

1. At the same time, Reynolds refused to provide bank records to substantiate the source of his downpayment. Rick Cossano, an executive vice president for Countrywide Funding, testified that "Mr. Reynolds indicated that because he was an African–American, Countrywide should be looking at him a little differently than we would if we would a normal white borrower because African–Americans tend not to trust banks and they don't keep records on hand." After Cossano insisted, Reynolds "indicated that based on the princi-

ple, he was not going to supply them to" Cossano, according to Cossano's testimony. Instead of denying the loan, Cossano decided to waive the condition.

2. In *Neder v. United States*, —— U.S. ——, 119 S.Ct. 1827, 1839–41, 144 L.Ed.2d 35 (1999), the Supreme Court held that materiality is an element under § 1344. In this case, the district court did not mention materiality in the jury instructions. However, because Reynolds did not object at trial, or argue on ap-

out Reynolds' assertion that the district court excused the government from proving materiality. At one point, the district court specifically noted that "materiality is an issue. If, for example, one had … liabilities of $75,000 and if by example, someone were to put down '$10,000,' a jury could find that that's a material misrepresentation." Nowhere does the district court state that materiality is not an element to be proven by the government.

■■■ Reynolds further asserts that the district court precluded his attorney from examining witnesses on the issue of materiality. However, the record shows that the district court in fact barred Reynolds from presenting evidence that the bank would not have relied on his representations. For example, Reynolds proffered that a witness would testify that regardless of judgments entered against Reynolds, the bank would have approved his loan application: "The proffer is this particular witness was told that it will be taken care of upstairs by a certain bank officer, the bank loan would be approved, submit what you have, it will be approved in spite of the judgments against Mr. Reynolds." The district court ruled that this testimony was inadmissible, because it did not affect the materiality of Reynolds' statements; rather, it only addressed the bank's reliance on those statements: "[A]n inquiry into—as to whether the bank relied or didn't rely on the representations or the omissions or the exaggerations, et cetera, is not relevant." Reliance is not an element of proving a § 1344 violation. *United States v. Allender,* 62 F.3d 909, 915 (7th Cir.1995) ("While § 1344(2) does require false or fraudulent pretenses, it does not require that anyone be fooled by them."). The only other instance cited by Reynolds on this issue involved a proffer of

testimony from a bank's vice president regarding the bank's general policies regarding unsecured loans. Reynolds explained that this evidence would show that "exceptions were made for Mr. Reynolds." The judge excluded this evidence as being confusing and a waste of time. Fed. R.Evid. 403. Evidence that the bank would not have relied on Mr. Reynolds' representations, and instead would have made an exception for him, does not establish that the representations were immaterial; that is, the representations would not have a tendency to influence the bank's decision making. No error was committed.

■■■ Reynolds' argument on materiality also miscomprehends the definition of materiality. After quoting *Pribble's* definition of materiality, 127 F.3d at 587 ("hav[ing] a natural tendency to influence, or being capable of influencing, the decision of the decisionmaking body to which it is addressed"), Reynolds states that this inquiry focuses specifically on the defendant's ability to affect the decision of the "victim." Appellant's Reply Br. at 7. This is wrong. A statement is material if it would be capable of influencing the decisionmaker's decision; as we have said, there is no requirement that the statement must in fact influence the decisionmaker (that would be reliance). *See United States v. Yoon,* 128 F.3d 515, 525 (7th Cir.1997) (no one need be deceived to prove a § 1344 violation). Thus, the proper inquiry addresses not the defendant's ability to influence, but rather the nature of the statements made. Because Reynolds' false statements regarding his financial condition could clearly influence a bank deciding whether to approve a loan (even if they did not in fact influence the

peal, that the jury instructions pertaining to bank fraud were erroneous, we review for plain error. The jury instructions in the case are virtually identical to those discussed in *Pribble.* There, we held that because the jury instructions discussed fraud, and "fraud embodies the concept of materiality," the jury

instructions "adequately place[d] the question of materiality before the jury." 127 F.3d at 589 (citations omitted). Although there is no plain error here, in the future, given the Court's ruling in *Neder,* district courts should include materiality in the jury instructions for § 1344.

decision), Reynolds' argument on materiality must fail.

### B. Jury Instructions on Union Contributors

■ Reynolds next claims that the district court's jury instructions erroneously stated that a candidate for federal office is prohibited from accepting any campaign funds from a labor organization. Section 441b of Title 2 unambiguously states: "(a) It is unlawful for ... any labor organization[ ] to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative ... are to be voted for...." As the court's jury instructions closely track this statute, Reynolds' argument seems headed for a dead end.[3] But Reynolds explains that a federal candidate may accept campaign funds from a PAC which only accepts voluntary contributions from union members. And Reynolds did receive funds from a federal PAC. But to call these funds the union's money requires a false assumption that a union member's personal money is the same as the union's money. Calling the money in these PACs "union money" is an odd label: with a voluntary PAC contribution the union never possesses the funds in the first place. The money is presumably paid to the employee by the employer (or from another source), and then voluntarily given to the political action committee. Money which union members voluntarily give to a political action committee is certainly not part of the union's treasury. This distinction was presented in the indictment (which the jurors had), in opening and closing arguments, and through evidence at trial. In fact, Lois G. Lerner, associate general counsel for the Federal Election Commission, testified that funds a union receives in mandatory dues from members can never be used in a federal campaign. She also noted that a union could form a PAC to solicit funds, on a voluntary basis, from union members, but that only voluntary contributions could be passed along to federal candidates. While it would have been preferable for the jury instructions to reiterate this distinction, the jury instructions did not misstate the law, and this issue was adequately presented to the jury.

### C. Requests for Continuances

■ Reynolds has several other complaints, among them that the district court refused to grant a continuance, that the district court erred in declining to question a juror about Minister Farrakhan, and was biased and functioned as an advocate for the prosecution. Each of these issues is reviewed deferentially, recognizing that there may be no single right answer. We first review the request for a continuance. In November, 1996, shortly after the indictment, Reynolds was represented by attorneys Rick Halprin and Jeff Steinback. The district court scheduled a pretrial conference for December 30, 1996. On December 30, 1996, Halprin and Steinback withdrew as counsel, and the district court scheduled a pretrial conference for January 24, 1997, and set trial for March 4, 1997. In January, 1997, Michael King, Kurt Feuer, and Amy Manning filed an appearance for Reynolds and stated that they would not be ready for trial on March 4, 1997. The district court then postponed the trial for two weeks, to March 18, 1997. Shortly thereafter, these attorneys withdrew, citing a conflict of interest. At this point in early February, the district court appointed Robert Loeb, a federal public defender, to represent Reynolds. Loeb filed two motions seeking to postpone the trial for several months; both were denied. Three days before the trial was to start, Reynolds informed the court that he wanted to represent himself. The district court ordered Loeb to serve as standby counsel. Reynolds then filed his own motion for

---

**3.** The district court instructed the jury that "[u]nder the Federal Election Campaign Act, it is unlawful for any candidate, political committee, or other person knowingly to accept or receive any contributions from a labor organization."

continuance, and sought a writ of mandamus from this court. Both were denied.[4] Finally, on March 21, 1997, the trial date, Reynolds appeared with three attorneys: Loeb (who had been ordered to be standby counsel), William Hooks and Michael Coffield. Because Hooks and Coffield were not prepared for trial, the district court excused them, and reappointed Loeb as counsel for Reynolds. The process of impaneling a jury was then initiated. On March 24, 1997, Hooks was granted leave to appear on behalf of Reynolds, conditioned on his not asking for a continuance. Then trial proceeded.

■ In reviewing this claim, we bear in mind that "a trial date once set must be adhered to unless there are compelling reasons for granting a continuance." *United States v. Bush*, 820 F.2d 858, 860 (7th Cir.1987). In this case, the district court did grant a two-week continuance, but refused to grant the continuance request for 6–9 months, and also the 30–45-day continuance requested on the day the jury was to be impaneled. Nothing Reynolds asserts can be construed as a compelling reason for requiring these two continuances to be granted. Richard Loeb, an attorney with over twenty years' experience as a prosecutor and as defense counsel, was appointed on February 7, 1997; trial did not begin until March 21, 1997. His representation was briefly interrupted because Reynolds decided to represent himself, but even then, Loeb was still involved in the case as standby counsel. Moreover, Reynolds' choice to retain new counsel on the eve of trial does not warrant a continuance. We note that Reynolds did not cause his first two sets of counsel to withdraw; however, the district court granted a substantial continuance when this occurred, providing adequate time for new counsel to get up to speed. Moreover, the government allowed Loeb access to its documentary evidence and provided witness statements in advance of trial. In sum, Loeb had more than five weeks to prepare for trial. Under these circumstances, the denial of a continuance based on Reynolds' changing of counsel was not an abuse of discretion.

## D. Refusal to Voir Dire the Jury

■ Reynolds also complains that Louis Farrakhan, a recognizable public figure, attended portions of the trial as a spectator. A juror sent a note to the judge which stated, verbatim: "Your Honor, I feel the presence of Louis Farakan is distracting and quite possibly detrimental to these proceedings." Reynolds asked the district court to voir dire the juror, to inquire if Farrakhan's presence had prejudiced the juror in some way. The district court refused, stating that conducting voir dire would bring additional attention to this issue, thus exacerbating the problem. Instead, the judge issued a curative instruction to the entire jury, admonishing them that spectators have a right to view the trial, and that they must decide the case based on the evidence presented to them, and for no other reason. He also noted to the attorneys that if this issue should come up again, involving Farrakhan or another spectator, with this juror or another juror, he would address it on a case by case basis.

No one has suggested that Farrakhan had contact with any of the jurors. Reynolds sought voir dire solely on the issue of whether the mere presence of Farrakhan would have unduly prejudiced the jury. Under these circumstances, the district court did not abuse its discretion in refusing to voir dire the jury. As we recently noted in *United States v. Magana*, the judge's voir dire (during deliberations) could cause jurors to focus disproportionately on the subject matter under inquiry. 118 F.3d 1173, 1185 (7th Cir.1997). The same principle applies during trial. Interrupting the proceedings to quiz jurors about Farrakhan (or any other well-known

---

4. The judge postponed the trial for two days due to its own scheduling conflict, and then postponed the trial an additional day to allow this court to review the mandamus request.

observer for that matter) could be distracting if not damaging. The trial judge has to make that call. In the absence of any evidence of jury tainting, and in light of the judge's curative instruction, we conclude that the district court did not abuse his discretion in refusing to voir dire the jury.

## E. Judicial Bias

 In addition to the specific rulings addressed above, Reynolds contends that the district court was biased against him. Reynolds cites over twenty instances where he perceives judicial bias. Most of these instances involve the district court interrupting the examination of the witness, either to clarify testimony which would otherwise be confusing or speculative, or to have counsel lay a proper foundation for the questions asked. For instance, on direct examination of Reynolds, Reynolds testified that his wife was involved in his 1988 campaign. Reynolds' counsel began eliciting facts relating to Mrs. Reynolds' involvement in the campaign office, when the judge interjected and requested that a better foundation be laid. Reynolds' counsel proceeded to establish a time frame for her involvement with the campaign, and testimony proceeded. Similarly, Reynolds was asked about the involvement of James Worthington in his campaign. When Reynolds was asked whether Worthington ever ran errands for the campaign, Reynolds answered "I think in 1989 that would be true. 1989 to '90 campaign." The judge interjected, requesting a better foundation for the question. Reynolds' attorney then laid a proper foundation for the time frame involving Worthington, and direct examination continued. These interruptions are innocuous, and certainly constitute no evidence of bias or prejudice.

In one of the more substantial exchanges, at sidebar, Reynolds' counsel sought voir dire *of the district court* regarding the district court's familiarity with a witness.[5] The district court asked counsel to make a proffer or explain any inference he was making. Counsel responded that he did not have a proffer to make. There was obviously a miscommunication between the court and counsel in this instance, but given that it was outside the presence of the jury, and involved an unusual request to ask questions of the court, this miscommunication does not amount to much of anything, and certainly nothing approaching error.

Another instance raised by Reynolds actually contradicts his claim of judicial bias. Reynolds' counsel asked a witness if a bank loan officer would note the specific job held by a loan applicant in the memorandum the bank uses to summarize relevant information concerning a loan; the witness answered "yes." Then, Reynolds' counsel asked if that information would be included if the applicant were a bus driver with the Chicago Transit Authority, and the witness again answered yes. Out of the presence of the jury, the government objected, pointing out that one of the jurors is employed by the Chicago Transit Authority as a bus driver, and sought to exclude the juror. Attorney Loeb explained that the attorney who asked the question, William Hooks, was not present on the day this particular juror was impaneled. Further, Mr. Hooks explained that he represents the Chicago Transit Authority in certain arbitration hearings, and that is why he mentioned the bus driver occupation. The district court was satisfied, and denied the motion to exclude the juror. The district court did express initial skepticism at Mr. Hooks' representation that he was unaware of the jurors' occupations. However, he did accept Mr. Hooks' representations and let the matter drop. This episode shows evenhandedness if anything, and especially because it was outside the

5. The witness, David Stewart, is married to Judge Ann C. Williams of the Northern District of Illinois. Defense counsel brought the fact out at the beginning of his cross-examination.

presence of the jury, it is difficult to imagine it having any impact on the jury's verdict.

We have reviewed each instance cited by Reynolds, and conclude that neither individually nor taken as a whole do they support an inference of judicial bias or improper demeanor. As a general matter, district courts are allowed, if not encouraged, to "make the interrogation and presentation effective for the ascertainment of the truth [and] to avoid needless consumption of time...." Fed. R.Evid. 611; *see also United States v. Levine*, 180 F.3d 869 (7th Cir.1999). As a final comment on this issue, it should be noted that the district court advised the jury to disregard any inferences it might draw concerning his comments or rulings from the bench, and reiterated that the jury was sole trier of facts in this case. Of course, we presume juries follow instructions. *United States v. McClellan*, 165 F.3d 535, 550 (7th Cir.1999). While this instruction may not be sufficient to cure the prejudice where a judge acts egregiously, it is certainly sufficient under the facts of this case to render any potential prejudice harmless.

## F. Sentencing

Finally, Reynolds challenges the way the district court determined his sentence under the Federal Sentencing Guidelines. The district court imposed a four-level increase because it found that Reynolds was a leader and organizer of a criminal activity which involved five or more participants, or was otherwise extensive. U.S.S.G. § 3B1.1(a). The district court found that four persons besides Reynolds were participants in his criminal activities: Marisol Reynolds (Reynolds' wife at the time), Terry Bernstein, Earl Worthington and Sophia Green. These participants were all campaign workers who benefitted from Reynolds' illegal campaign activities, and helped facilitate them. The district court added the conspiracy lasted over five years, involved millions of dollars, involved sham ward organizations designed to launder money from unions, and required deceiving the Federal Election Commission, the Internal Revenue Service, and the general public. Therefore, even if there were not five or more participants (including Reynolds), we would agree with the district court that this scheme was extensive, and justified the four-level sentence enhancement.

For the foregoing reasons, we AFFIRM Reynolds' conviction and sentence.