In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2983

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES E. FARR,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 00-CR-187—**Rudolph T. Randa**, *Judge.*

ARGUED FEBRUARY 26, 2002—DECIDED JULY 24, 2002

Before FAIRCHILD, COFFEY, and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* James Farr was engaged in a scheme of defrauding banks while purchasing real estate and refinancing mortgages. As a result of this fraudulent enterprise, he was charged in a four-count indictment with one count of bank fraud (18 U.S.C. § 1344), one count of interstate transmission of stolen funds (18 U.S.C. § 2314), and two counts of unlawful financial transaction (8 U.S.C. § 1957). Farr continued his con games throughout his trial, refusing to cooperate with his attorneys and making vague assertions regarding alleged missing documents and witnesses who could testify on his behalf. Despite Farr's machinations, the experienced trial judge refused to grant indefinite adjournments, and ultimately a

jury convicted Farr on all counts after a four-day trial. Farr appeals, arguing that the trial judge erred in refusing to grant the additional adjournment he requested and furthermore that his trial counsel was incompetent in failing to meet with him and failing to interview his alleged witnesses. We affirm.

## I. Factual Background

Beginning in Februaury 1996 and continuing through March 1998, James Farr was involved in a series of seventeen (17) fraudulent real estate transactions and one loan transaction in which he provided lenders with inaccurate financial information. Farr's scheme was relatively simple. Although he had failed to file federal tax returns in 1993, 1994, 1995, 1997 and 1998, he submitted fraudulent copies of 1993 through 1996 tax returns to the victim lenders, which placed his income well beyond his actual earnings, as well as false W-2 statements. Farr also submitted to the defrauded lenders false payroll statements that inflated his salary and false personal financial statements, thus fraudulently increasing his total net worth. Before the unraveling of Farr's dishonest scheme, he had defrauded the victim banks of more than $1.2 million.

Farr's first fraudulent transaction occurred on February 29, 1996, when he approached the Equitable Bank in Wauwatosa, Wisconsin, a federally insured financial institution, in order that he might obtain the necessary financing to purchase a $455,000 home in Mequon, Wisconsin. Farr reported to Equitable that his monthly salary was $13,917 and submitted false 1994 and 1995 federal income tax returns and W-2 forms for those years in support of his application. In addition, Farr deposited a $54,208 check drawn on his mother's closed bank account into his personal account in order that he might inflate the balance of his personal account to satisfy Equitable's request for

proof of funds. Farr also composed a fictitious letter, purportedly authored by a fund manager, "verifying" the source of the $54,000 deposit to Farr's bank account. As a result of the false information supplied by Farr, Equitable extended a $400,000 loan to him, and Farr purchased the Mequon property.

Farr continued his dishonest ways, and in April 1996, he refinanced four properties that he owned with EQ Financial and submitted inaccurate copies of his 1994 and 1995 federal income tax returns to support his transactions. In May 1996, he refinanced loans for two properties (one of which was the Mequon property purchased three months earlier), and again submitted false tax returns and W-2 statements to the lender, Bankers Wholesale Mortgage. Bankers Wholesale disbursed the loan to Farr from Indiana and the proceeds were deposited into his Wisconsin checking account, and thus the funds he obtained traveled through interstate commerce. Farr was able to perpetuate his deceitful enterprise through March 1998, as he continued to submit false federal income tax returns and W-2 statements thus enabling him to refinance other properties and obtain additional mortgages.

Ultimately Farr's scheme unraveled, and on September 26, 2000, a grand jury sitting in the Eastern District of Wisconsin returned the four-count indictment referred to above. At his October 31, 2000, arraignment Farr pleaded not guilty. The government advised the court that discovery would be available in a few days. Further, at the arraignment, the magistrate restricted Farr's travel to the Eastern District of Wisconsin and Puerto Rico. The magistrate set a trial date of December 11, 2000.

On November 1, 2000, Farr's first attorney filed a motion to withdraw at Farr's request because Farr was not satisfied with the performance of his attorney and furthermore because Farr had not complied with the terms of the re-

tainer agreement. At the same time, Farr's first attorney requested that the previously set trial date of December 11, 2000, be adjourned so that the successor attorney might have sufficient time to prepare. The judge agreed and granted both motions.

Farr's second attorney was appointed on November 9, 2000, and on November 22, 2000, the trial date was adjourned to January 29, 2001. For reasons not disclosed in the record, Farr elected to spend the vast majority of his time during the months before his trial in Puerto Rico, rather than in the Eastern District of Wisconsin and thus was of little assistance to his attorney in preparing his defense. Despite Farr's decision to remain in Puerto Rico, the record demonstrates that his attorney diligently prepared for trial, reviewing the discovery material made available by the government on November 10, which consisted primarily of documents directly related to the fraudulent loan transactions. In addition, Farr's attorney also had the benefit of a portion of the government's own work product in the form of its 9-page summary and outline of the case.

Despite Farr's counsel's best efforts to prepare for trial without the assistance of his client, counsel appeared (without Farr) on January 26, 2001, three days before trial and requested the trial judge grant a *second* motion to adjourn the trial date. According to counsel, he still had yet to meet with Farr because Farr chose to absent himself from the Milwaukee, Wisconsin, area, staying in Puerto Rico throughout the trial-preparation time period. According to Farr's counsel, Farr planned on remaining in Puerto Rico until the eve of trial, January 28, 2001, and Farr in fact returned no earlier than January 28. Although counsel had occasionally spoken with Farr over the telephone, the primary means of communication with him was through electronic mail (e-mail). Not surprisingly given the sporadic nature of Farr's communication, Farr's counsel informed

the court during the January 26 hearing that he had no productive input from his client and requested the second adjournment in order that he might have the opportunity to review the numerous financial documents with Farr in person.

The government opposed the motion and noted that Farr had possessed discovery documents for almost 70 days. In addition, the government went so far as to provide defense counsel with an outline of the government's case against Farr in hopes of assisting him with his preparation and organization of the case. The judge commented that defendants are often reluctant to "face the music" and that the government had bent over backwards in providing a work product outline, but did grant the motion, and trial was reset and scheduled to begin on February 5, 2001.

Despite the trial judge's grant of an additional week to prepare, Farr failed to contact his counsel until January 31, 2001, five days after the judge had granted the most recent, one-week adjournment of the trial date. In addition, during the week between January 29 and February 5, Farr took it upon himself to meet with his attorney *only one time*, and remained at the meeting for only a little more than one hour. Even after Farr returned from Puerto Rico, he failed to provide his attorney with either a phone number where he could be contacted directly or an address where he might be located. Instead, Farr only provided his attorney with indirect means to communicate with him, giving his attorney nothing but a voice-mail number where he could leave messages and his e-mail address. After the January 31 meeting, Farr's attorney did leave a message on Farr's voice mail asking Farr to contact him at his office and Farr failed to return the call.

Despite Farr's consistent refusal to cooperate with his counsel and assist in the preparation of his defense in addition to the government's more than generous produc-

tion of its work product to assist counsel in preparing for trial, Farr nevertheless claimed, on the morning that the trial was scheduled to begin, that his counsel was unprepared and once again asked for an adjournment. Farr claimed that counsel had failed to review documents and interview witnesses necessary for his defense, in spite of the fact that Farr had never provided counsel with the substance of those witnesses' statements. The judge declined to adjourn the trial for a third time.

At trial, the government introduced a mountain of documentary evidence to establish that Farr repeatedly submitted false income tax returns and W-2 statements in support of his loan applications or refinancing of mortgages. Further the government presented numerous witnesses to establish that Farr knew his representations to be false. In Farr's defense, counsel attempted to convince the jury that the banks Farr had defrauded failed to diligently investigate the veracity of the documents Farr submitted in support of his application. In support of the theory that the banks should have been alert and aware that Farr was attempting to defraud them, Farr's attorney repeatedly referenced the neighborhood in which Farr resided, an undesirable Milwaukee neighborhood, and at times referred to Farr, an African-American, as a "brother." Counsel suggested that Farr's place of residence, coupled with the fact that he sought a $400,000 loan should have raised "red flags," alerting the bank to conduct a more thorough background check and investigation regarding Farr's financial resources and ability to meet the terms of the loan agreement before it extended the loan to him. The jury rejected Farr's theory and convicted him on all accounts. Farr appeals.

## II. Issues

On appeal Farr initially argues that the trial judge abused his discretion when he denied the defendant's third

motion to continue the trial. Farr next argues that his counsel was ineffective in his trial strategy and preparation.

### III. Analysis

Farr's initial argument on appeal is that the trial judge abused his discretion when he denied the third motion to continue the trial, raised on the morning of the trial. We will reverse a trial court's denial of a continuance only for an abuse of discretion and a showing of actual prejudice. *United States v. Schwensow*, 151 F.3d 650, 656 (7th Cir. 1998). In reviewing a claim that a trial judge abused his discretion in denying a continuance, we bear in mind that "a trial date once set must be adhered to unless there are compelling reasons for granting a continuance." *United States v. Reynolds*, 189 F.3d 521, 527 (7th Cir. 1999). At the same time, we note that "'myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.'" *United States v. Depoister*, 116 F.3d 292, 294 (7th Cir. 1997) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)). Consequently, in evaluating a request for a continuance, a trial court must weigh a number of factors: 1) the amount of time available for preparation; 2) the likelihood of prejudice from denial; 3) the defendant's role in shortening the effective preparation time, 4) the degree of complexity of the case; 5) the availability of discovery from the prosecution; 6) the likelihood a continuance would satisfy the movant's needs; and 7) the inconvenience and burden to the court and its pending case load. *United States v. Avery*, 208 F.3d 597, 602 (7th Cir. 2000); *United States v. Windsor*, 981 F.2d 943, 947 (7th Cir. 1992). The factors will be deserving of varying weight in each situation confronted by a trial judge, and the trial judge is in "the best position to evaluate and assess the circumstances presented by [Farr's] request for a continuance." *Schwensow*, 151 F.3d at 656.

Based upon this record, none of the factors listed above weigh in favor of granting Farr a third continuance, and we refuse to agree with Farr's meritless argument that the trial judge abused his discretion in declining to grant a third continuance. At the outset, we note that Farr and his attorney had both adequate time and access to discovery in order to prepare for trial if Farr had seen fit to cooperate with his attorney. Because Farr chose to avoid his responsibilities to his attorney and in turn avoid the Milwaukee, Wisconsin area, he supplied his version of the events to his attorney through e-mail correspondence. Farr's counsel was given the benefit of an opportunity for review of the government's discovery material some *70 days* before trial. *Reynolds*, 189 F.3d at 526 (no abuse of discretion where trial court granted several continuances when defendant's counsel withdrew and provided more than five weeks of time for replacement counsel to prepare for trial). In addition, the government took the extraordinary step of making available a nine-page summary and outline of its theory of the case. Furthermore Farr had been granted two continuances on prior occasions and had remained in Puerto Rico until the eve of the trial during the time frame when he should have been in the Milwaukee area to discuss and review the case with his attorney. In view of the defendant's reluctance to cooperate with his attorney, the trial court was absolutely under no obligation to permit another delay in the trial of the case to enable him to review with his attorney documents that both he and counsel had possessed for many months. *Schwensow*, 151 F.3d at 656; *Depoister*, 116 F.3d at 295 (no abuse of discretion where trial judge declined to grant continuance where defendant had received three continuances and where relevant discovery had been made available and readily accessible to defendant).

More notably, Farr repeatedly refused to cooperate with counsel and stonewalled each and every one of his

counsel's attempts to prepare for trial, and it is eminently clear that it is the defendant Farr who is solely responsible for the shortening of the preparation time. In short, Farr had to be dragged kicking and screaming into counsel's office, not much unlike a kindergartner being sent to school for the first time and ending up in the principal's office. Furthermore, Farr *chose* to remain in Puerto Rico until the eve of trial. Even when the trial judge generously granted a last-minute, one-week reprieve in order to allow Farr to meet with his attorney, the defendant took it upon himself to meet with his counsel for but one hour during that week, failing even to provide his counsel with a telephone number or address where he could be contacted directly. When offered a chance to explain his reasons why a continuance was necessary, Farr only stated that he "had maybe 35 minutes of legal representation . . . [and] there [has] not been one person that [has] been interviewed on my behalf . . . ." We point out that there is nothing in this record to demonstrate any *valid* reason that prevented Farr from spending additional time with his attorney than the one hour referred to above. The end result was brought on exclusively by the defendant's own calculated and stubborn refusal to cooperate with his attorney and remain in Puerto Rico. Where a defendant's obstinate behavior played a significant part in undermining the ability of counsel to prepare for trial, we have refused to find error when a trial judge declined to grant a continuance. *See United States v. Studley*, 892 F.2d 518, 521-22 (7th Cir. 1989) (affirming the trial court's denial of a motion for a continuance where the defendant's insistence on proceeding *pro se* until one week before trial played a significant part in undermining the ability of counsel to prepare for trial).

Farr argues vainly that the case was complex, and that trial counsel asserted that he was not prepared on January 26 and therefore could not possibly be prepared on Febru-

ary 5 because counsel never interviewed witnesses in the interim. But another element of Farr's lack of cooperation was his failure to inform his attorney about the substance of any of the alleged witnesses' testimony. Indeed, when given a chance to explain the reasons why a continuance should be granted, Farr only stated that his attorney had failed to interview witnesses on his behalf, but did not name a single witness who could help his cause, much less identify the substance of their alleged testimony. The mere possibility that Farr's counsel could have dredged up some testimony from these witnesses (whose names and potential testimony are unknown) is wholly speculative and is an insufficient basis on which to demand a continuance. *United States v. Robbins*, 197 F.3d 829, 847 (7th Cir. 1999); *United States v. Knorr*, 942 F.2d 1217, 1222 (7th Cir. 1991).

If we were to accept Farr's argument, all a defendant would need to do to perpetuate a trial *ad infinitum* would be to petulantly stamp his foot and refuse to cooperate with counsel (thus ensuring counsel was never properly prepared). The continuing saga would lead to absurd results, and we refuse to even consider, much less adopt, a rule that might suggest that a trial court should tolerate a calculating and mischievous defendant and grant indefinite continuances to a defendant who refuses to cooperate with his attorney. The record clearly establishes that the trial judge went out of his way in granting Farr two continuances and that the government likewise was more than considerate in providing its work product to Farr's counsel to assist with his defense. The trial judge's action in denying Farr's motion to postpone the trial a third time falls far short of meeting the abuse of discretion standard.

Farr's second argument, that his trial counsel was ineffective, is equally without merit. Farr (who is represented by different counsel on appeal) now argues that his trial

counsel was ineffective, raising four reasons why his trial counsel was ineffective. First, Farr claims that trial counsel failed to investigate or interview witnesses necessary for his defense. Second, Farr claims that trial counsel improperly promulgated a race-based defense. Third, Farr claims that trial counsel's communication with him was inadequate in preparing the defense. Finally, Farr claims that trial counsel failed to file a Rule 29 motion before the trial court to review the sufficiency of the evidence.

We note that this court often cautions defendants that an ineffective assistance of counsel claim is best raised on a motion for habeas corpus, and not on direct appeal. *United States v. Godwin*, 202 F.3d 969, 973 (7th Cir. 2000). This is because typically such claims are very unlikely to find any factual support in the trial record. *Id.*; *United States v. Johnson-Wilder*, 29 F.3d 1100, 1104 (7th Cir. 1994). Furthermore, an appellate court is not as well suited to review counsel's performance on direct review as it is on collateral review because the appellate court, unlike the trial court, has not had "the opportunity to observe counsel's performance firsthand, and typically, there has been no chance to develop and include in the record evidence relating to the ineffectiveness claim." *United States v. Boyles*, 57 F.3d 535, 550 (7th Cir. 1995). Despite the lack of a fully developed factual record, Farr's appellate counsel nevertheless charged forward with the ineffective assistance of counsel claims, though they would have been better brought on a habeas motion than upon direct appeal where counsel could have supplemented the record with the testimony of the alleged witnesses Farr claims his trial counsel should have interviewed.

A defendant claiming ineffective assistance of counsel must establish that his attorney's performance was seriously deficient and that he was prejudiced by the performance. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *United States v. Hall*, 212 F.3d 1016, 1021 (7th Cir. 2000).

With regard to the performance prong, the defendant must direct us to the specific acts or omissions that allegedly form the basis of his claim. *Hall*, 212 F.3d at 1021. We have observed in the past that criminal defendants frequently "demonize" their lawyers. "If we are to believe the briefs filed by appellate lawyers, the only reasons defendants are convicted is the bumbling of their predecessors. But lawyers are not miracle workers. Most convictions follow ineluctably from the defendants' illegal deeds." *Burris v. Farley*, 51 F.3d 655, 662 (7th Cir. 1995).

We presume that counsel is effective, and a defendant bears a heavy burden in making out a winning claim based on ineffective assistance of counsel. *Hall*, 212 F.3d at 1021. "[M]any trial tactics, like so many other decisions that an attorney must make in the course of representation, [are] a matter of professional judgment." *Id.* (internal quotation omitted). Thus, we resist a natural temptation to become a "'Monday morning quarterback.'" *Id.* (quoting *Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990)). We will not second-guess trial tactics that are rationally based. *United States v. Zarnes*, 33 F.3d 1454, 1473 (7th Cir. 1994). "'It is not our task to call the plays as we think they should have been called. On the contrary, we must seek to evaluate the conduct from counsel's perspective at the time, and must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance.'" *Hall*, 212 F.3d at 1021 (quoting *United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir. 1991)).

Should the defendant satisfy the performance prong, he must next demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Matheny v. Anderson*, 253 F.3d 1025, 1039-40 (7th Cir. 2001). As we have noted so often, conclusory allegations do not satisfy *Strickland's* prejudice component. *Boyles*, 57 F.3d at 550; *United States v. Woody*, 55 F.3d 1257, 1272 (7th Cir. 1995).

Farr fails to point us to any evidence in the record that supports his claim that his trial counsel was ineffective, and instead relies upon nothing but vague and general allegations. For example, Farr claims that his attorney should have tracked down and interviewed several witnesses in spite of the fact that he failed to supply his trial counsel with the witnesses' names and addresses, much less advise him of the specific information those witnesses possessed that might serve to exculpate him. A defense attorney is not obligated to track down each and every possible witness or to personally investigate every conceivable lead. *Sullivan v. Fairman*, 819 F.2d 1382, 1391 (7th Cir. 1987). An ineffective assistance of counsel claim cannot rest upon counsel's alleged failure to engage in a scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found. *United States v. Menzer*, 200 F.3d 1000, 1005 (7th Cir. 2000); *United States ex rel. Kelba v. McGinnis*, 796 F.2d 947, 957-58 (7th Cir. 1986).

Furthermore, even if Farr could demonstrate that his trial counsel's failure to interview alleged witnesses (despite Farr's failure to provide names or addresses) fell below an objective standard of reasonable performance, Farr has failed even to attempt to demonstrate that counsel's failure to interview witnesses prejudiced him. Indeed, he could not as the record contains no evidence of any prejudice for the simple reason that there has not been an evidentiary hearing where the substance of those witnesses' testimony would have been presented. Instead, Farr makes nothing but a blanket, conclusory statement, unsupported by any facts or case law, that trial counsel's failure to interview any witnesses is *per se* prejudicial. A defendant has the burden of supplying "sufficiently precise information [regarding] the evidence that would have been obtained had his counsel undertaken the desired investigation, and of showing whether such information . . . would

have produced a different result." *United States v. Rodriguez*, 53 F.3d 1439, 1449 (7th Cir. 1995) (omission in original) (internal quotations omitted). Farr has failed to offer even the barest indication of what potentially exculpatory information the alleged witnesses would have provided.

Farr's second ineffective assistance of counsel argument, that trial counsel improperly introduced a race-based theory of defense, is likewise meritless. Farr argues that counsel's reference to him throughout trial as "brother," a pejorative race-based term, rendered his assistance ineffective. Farr fails to argue, however, how the outcome of his trial would have been different had counsel referred to him differently. While counsel's choice to employ the use of the term "brother" might have been in poor taste and questionable, it falls far short of establishing that counsel's choice of defense theory prejudiced Farr. In the past, we have refused to find ineffective assistance of counsel where the attorney referred to his client in derogative terms, such as "common thief." *See Woody*, 55 F.3d at 1272. Instead, in order to prevail on an ineffective assistance of counsel claim, the defendant must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Matheny*, 253 F.3d at 1039-40. Farr has failed to satisfy this burden.

In the case before us, the government presented an insurmountable amount of evidence, both documentary and live-witness testimony, in establishing that Farr fraudulently obtained loans from the victim banks and lending institutions by repeatedly misrepresenting his income and assets. Farr's counsel attempted to exculpate Farr by demonstrating that the bank was grossly negligent, even reckless, in extending a $400,000 loan to a person whose residence in a lower-class neighborhood highlighted the possibility that he was without the necessary financial means to repay such a loan, and thus argued that the bank was not de-

frauded. Given the overwhelming quantum of evidence that the government presented, Farr's counsel's decision to shift the blame to the banks for extending the loans seems to be a rational and intelligent trial strategy, and we refuse to second-guess trial counsel's trial strategy. *Boyles*, 57 F.3d at 551.

Farr's remaining arguments merit little discussion. He claims that his trial counsel was ineffective for failing to communicate sufficiently with him in preparation for his defense. But as noted above, Farr repeatedly avoided contact with his defense attorney and cannot now claim that his trial counsel was ineffective for failing to hunt through a haystack to find a needle. Farr absented himself form the court's jurisdiction and thus made himself unavailable except for communication via e-mail and voice mail. It was not counsel's responsibility to drag Farr kicking and screaming into his office. Similarly, Farr's argument that counsel was ineffective in failing to file a motion pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure for a judgment of acquittal is also without merit. Farr does not even challenge the sufficiency of the evidence on appeal, suggesting that this argument is entirely frivolous.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*