# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2876

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK O. ISAACS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 186—**Joan Humphrey Lefkow**, *Judge*.

ARGUED MAY 12, 2009—DECIDED JANUARY 25, 2010

Before KANNE and SYKES, *Circuit Judges*, and VAN
BOKKELEN, *District Judge*.*

* The Honorable Joseph S. Van Bokkelen, United States District
Court Judge for the Northern District of Indiana, sitting by
designation.

The panel wishes to thank Jason Huber and Travis Kennedy
of the Edwin F. Mandel Legal Aid Clinic, The University of

(continued...)

VAN BOKKELEN, *District Judge*.  Following a jury trial, Mark O. Isaacs was convicted of fraudulently using unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2). He was ordered to serve a prison term of forty months and pay $573,400 in restitution. Isaacs appeals, contending that the district court abused its discretion by denying his motion for a thirty-day continuance after the government turned over a new version of voluminous computer records in the form of compact disks ("CDs") three days before trial. He further asserts that the district court abused its discretion by admitting the government's summary exhibits at trial after the government failed to turn over the underlying data at a reasonable time and place as required by Federal Rule of Evidence 1006. Finally, Isaacs avers that the district court abused its discretion by limiting his cross-examination of a key government witness regarding the P2K database or system. Because the district court did not abuse its discretion with respect to these issues, we affirm the judgment of the district court.

**I.**

PrimeCo Personal Communications, Inc., a former telecommunications provider, was in the business of selling cellular phones, cellular phone service, and prepaid phone or payment cards. Through either a

---

\* (...continued)
Chicago Law School, for representing Mark O. Isaacs on the appeal in this case.

PrimeCo store or an authorized PrimeCo dealer, PrimeCo customers could purchase prepaid phone cards and load the value of the cards (minutes or credits) onto their PrimeCo phone accounts. To activate the minutes on a prepaid phone card, PrimeCo customers would call a toll-free number and enter certain information, including the PrimeCo phone number associated with the account, the account number to which the credit was to be applied, and a personal identification number ("PIN") that was listed on the back of the prepaid phone card. Each prepaid phone card had its own unique PIN and each PIN was associated with one value that was to be credited to only one PrimeCo phone account.

In March and April 2001, a glitch was discovered in PrimeCo's computer system, which permitted the loading of prepaid phone card values onto multiple PrimeCo phone accounts using a single PIN. As a result, PrimeCo initiated an internal investigation and found that, after a call was placed to the toll-free number and a PIN was entered, it took between forty-five seconds and one minute and fifteen seconds for the computer's database to query the system and determine if that particular PIN was available. During that time period, simultaneous calls could be made to the toll-free number to credit the same PIN to multiple PrimeCo phone accounts. The investigation uncovered that certain PrimeCo prepaid phone cards were being used to credit multiple PrimeCo phone accounts, and this problem was isolated to PrimeCo's Chicago market.

Ginny Toepfer, PrimeCo's Director of Information Technology, compiled three sets of data to analyze the

problem. First, Toepfer received data files from West Interactive, the company that maintained the computer program for the PIN card activations. That data included the phone numbers used to call and activate the PINs, the PINs that had been activated, the account numbers that were credited, the dollar amounts of the prepaid phone cards, and the dates of the phone calls. Second, PrimeCo's marketing department provided Toepfer with a listing of customers, who were active and in good standing, in PrimeCo's billing system. Finally, Toepfer was given a listing of PrimeCo's indirect dealers.

Toepfer compiled the information she received into one database.[1] After analyzing the data, she generated summary exhibits that were admitted into evidence as the Government's Exhibits 2d and 2e. The summary exhibits were grouped by PIN, and after each PIN the summary exhibits listed the following information: (1) the date and times the PIN was activated; (2) the phone numbers that were used to call the toll-free number to activate that PIN; (3) the dollar amount of the prepaid phone card that was activated; (4) the PrimeCo account number that was credited; (5) the name of the PrimeCo

---

[1] The data from the time period January 2001 through March 2001 was admitted into evidence on a CD marked as the Government's Exhibit 2. Some of the data relating to PrimeCo's customers, who were active and in good standing, was admitted into evidence on a CD marked as the Government's Exhibit 2A. The data from the time period August 2000 to December 2000 was admitted into evidence on a CD marked as the Government's Exhibit 2B.

authorized dealer associated with the phone number, if any; (6) the name of the PrimeCo customer associated with the phone number, if any; and (7) the total number of times the PIN was activated and the total dollar amount for each PIN.

Isaacs was the owner of four wireless telephone stores that operated under the name of Beep Smart. PrimeCo records established that Isaacs had a PrimeCo account number. An analysis of the summary exhibits showed that, during a seven-day sample period in January 2001, in eleven instances, his PrimeCo account number was among those accounts credited multiple times. Another analysis of the summary exhibits showed that, during a different seven-day sample period in January 2001, three phone numbers associated with one of Isaacs's Beep Smart stores were used fifty-nine times to load credits using PrimeCo prepaid phone cards.

On March 16, 2006, a federal grand jury returned a one-count Indictment against Isaacs, charging him with violating 18 U.S.C. § 1029(a)(2). Section 1029(a)(2) makes it illegal for an individual to "knowingly and with intent to defraud traffic[ ] in or use[ ] one or more unauthorized access devices during any one-year period, and by such conduct obtain[ ] anything of value aggregating $1,000 or more during that period." Isaacs was also charged with aiding and abetting in the illegal scheme under 18 U.S.C. § 2.[2]

---

[2] Wayne Mitchell operated cellular phone stores and was indicted as a co-defendant in the PrimeCo phone card scheme.

(continued...)

Isaacs entered a plea of not guilty to the charges and proceeded to trial. After a number of continuances of the trial date, a jury trial was set to begin on April 21, 2008. Isaacs chose to represent himself at trial with the assistance of stand-by counsel.

On the day the trial was set to begin, Isaacs filed an emergency motion to continue the trial for thirty days. On that same day, before proceeding to trial, the district court heard arguments on Isaacs's motion.

At the hearing, Isaacs argued that, just three days before trial, his stand-by counsel had received a new set of CDs containing voluminous computer records from the government. He asserted that he needed more time to compare the data on the new set of CDs, which comprised the underlying data used to compile the summary exhibits, to that which had been previously produced by the government on an earlier set of CDs. Isaacs further explained that the new set of CDs contained 25,000 pages of data and because it would take about six or seven hours to print the data, a continuance was warranted.

The government's counsel, however, represented that the new set of CDs contained the same underlying data that had been previously disclosed to Isaacs in 2006 on the earlier set of CDs. The government produced a new

---

[2] (...continued)
He entered a plea of guilty to access device fraud and was sentenced to twenty-six months in prison and ordered to pay $632,825 in restitution.

set of CDs before trial because the earlier set of CDs contained extraneous and inadmissible information, and one set of data lists was difficult to read. On the new set of CDs, the government redacted information related to a defendant in another case and PrimeCo and West Interactive data that was not related to the summary exhibits in this case. The government also converted one set of data lists from Microsoft Excel to Microsoft Access to make it more readable. The government's counsel explained that the redaction of the data and reformatting change did not effect the summary exhibits: they remained the same. Furthermore, the government's counsel had an understanding with Isaacs's prior counsel that the new set of CDs would be produced closer to trial and would only include the underlying data used to prepare the summary exhibits. The government's counsel stated there was a delay in producing the new set of CDs because the PrimeCo employee responsible for the summary exhibits no longer worked at the company.

Because Isaacs had concerns regarding the newly produced set of CDs, the government's counsel proposed to the district court that the underlying data previously produced to Isaacs on the earlier set of CDs be used as the basis for validating or admitting the summary exhibits at trial. The government's counsel, however, stated that the earlier set of CDs could not be viewed by the jury because that set of CDs contained irrelevant and inadmissible information, and one set of data lists was not in a viewable format. The district court agreed with the government's proposal and noted that Isaacs

could select which format he wanted to use; he had the option of using either the newly produced set of CDs or the earlier set of CDs for the purpose of validating the summary exhibits at trial. Therefore, the district court found no basis for delaying the trial and denied Isaacs's motion to continue.

The case proceeded to trial on April 21, 2008. Numerous witnesses testified as to Isaacs's involvement in the scheme to defraud PrimeCo. These witnesses were either Isaacs's former employees or former employees of his co-defendant, Wayne Mitchell. Many of these employees were in high school and worked part-time at the defendants' stores, when the defrauding scheme took place. Isaacs's former employees testified that Isaacs instructed them to tell a customer, who was interested in purchasing a PrimeCo prepaid phone card, that they were out of the cards, but if the customer left a phone number and account number on a piece of paper, the credit would be loaded onto the account later in the day. After taking a customer's phone number and account number, an employee would take the payment from the customer and then provide the customer with a receipt. Once an entire sheet of paper was filled up with enough customers seeking to purchase cards, that information would be provided to Isaacs or Mitchell; either Isaacs or Mitchell typically handled the sheets of paper containing the account numbers and phone numbers.

These witnesses also described Isaacs's direct participation in the loading of credits onto PrimeCo customer accounts; he participated either in person or by phone by use of a speaker phone. Typically, the process for

loading credits would involve Isaacs or Mitchell providing employees with the account numbers and phone numbers that were to be credited. To load credits, employees would call PrimeCo's toll-free number, enter the phone numbers, and once a recording was heard that asked for the PIN, someone would read the PIN aloud and the employees would input the PIN simultaneously, taking advantage of the computer's lag time. On some occasions, Isaacs read the PINs during the loading process. He often brought stacks of prepaid phone cards to the stores to be loaded onto customers' accounts. Furthermore, there was testimony that Isaacs's employees received additional pay or benefits for loading credits onto accounts.

Witnesses testified that Isaacs became involved in the loading of credits onto PrimeCo customer accounts in August 2000, and that activity continued until May 2001. After Isaacs became involved in the loading of credits, the employees began participating in the process more often. One witness testified that the loading of credits took place every night and involved one to three phone cards per night. However, after Isaacs became involved, the number of cards increased to six or seven per night and, within several months, the number of cards increased to twenty-five per night. Furthermore, subsequent to Isaacs's involvement, the number of employees who participated in the loading process increased. Accordingly, on the basis of the witnesses' testimony, the evidence showed that Isaacs improperly used a single PIN to credit multiple PrimeCo phone accounts and pocketed the money he collected from customers that was to be used for the purchase of the prepaid phone

cards; this illegal scheme resulted in losses in excess of $500,000 to PrimeCo.

Toepfer, a key government witness, also testified at trial. On direct examination, Toepfer testified regarding the database she developed, which comprised the underlying data in this case, and the creation of the summary exhibits. Isaacs sought to cross-examine Toepfer regarding the validity of the summary exhibits. Specifically, during cross-examination, Isaacs referred Toepfer to a page in one of the summary exhibits; however, Toepfer, who was using a summary exhibit that had been admitted into evidence, noted that the page Isaacs was using was different from the page she was using. There was a discrepancy in the two versions of the summary exhibits which entailed the transposition of two identical lines or time entries. After a brief consultation with stand-by counsel, Isaacs was able to continue his cross-examination by referring Toepfer to the version of the summary exhibits he was using and complete the point he wished to make regarding blank lines in the PrimeCo name column listed on the summary exhibits.

On direct examination, Toepfer further testified regarding PrimeCo's database of active customers known as the P2K database or system, which she received from PrimeCo's marketing department during the internal investigation. Toepfer stated that all the data she received during the internal investigation, was imported into one database she created; this data was maintained so that it could not be altered or changed. Specifically, Toepfer testified that once the data was imported into her database, which included the data from P2K system,

it was stored in a read-only format so that it could not be changed or altered by anyone.

On cross-examination, Isaacs believing that Toepfer testified that the P2K system could not be altered or changed, sought to question her about the integrity or security of the system. Specifically, Isaacs asked Toepfer: "And if an employee was to go into a section [of the P2K system] that they are not authorized, would that be grounds for them to be terminated?" (R. 253:14-16.) The government object to Isaacs's question on relevancy grounds. In responding to the government's objection, Isaacs stated that he thought his line of questioning was relevant because "during the direct [Toepfer] stated that certain—that some employees were not allowed to go into the P2K system. And that gives the jury the impression that this information is totally secured." (R. 254:1-4.) Isaacs stated he wanted to explore the issue of the security of the P2K system because he planned to cross-examine another government witness, Tina James. James, one of Isaacs's former employees, had improperly accessed the P2K system to deactivate a friend's phone. Isaacs, who believed that James was terminated from PrimeCo for the phone deactivation, explained that he did not want the jury to have the impression that the P2K system was secure.

In sustaining the government's relevancy objection, the district court stated that Isaacs could only question Toepfer about the integrity of the database she created, used, and described as secure because that was all the government's counsel had questioned her about on

direct examination. Isaacs, however, continued his cross-examination and was able to elicit from Toepfer that certain employees were able to access the P2K system and, if an employee went into a section of the system they were prohibited from accessing, that employee could be terminated.

James later testified on direct examination, that in her sales position at PrimeCo, she had some access to the P2K system and she once improperly accessed the system to deactivate a phone account. James stated that she was disciplined for deactivating the account and was later terminated for her involvement in the scheme to defraud PrimeCo and not for improperly accessing the P2K system. James also testified that certain employees had limited access to the P2K system.

After Isaacs rested his case and the CDs containing the underlying data and summary exhibits had been admitted into evidence, he asked the district court to allow the earlier set of CDs to be viewed by the jury. To support his request, Isaacs raised the issue of the discrepancy in the versions of the summary exhibits that he and Toepfer used during cross-examination. The government explained the discrepancy by noting that early in the discovery process hard copies of the summary exhibits were produced to Isaacs; those hard copies were an earlier version of what was later electronically produced to Isaacs one to two years before trial. The government explained that Toepfer did not prepare the earlier version of the summary exhibits and the discrepancy in the versions of the summary exhibits entailed the transposition of two identical lines

or time entries. Thus, a different program had been used to generate the earlier version of the summary exhibits which reversed the order of the entries; however, the data remained the same. The district court denied Isaacs's request to allow the jury to view the earlier set of CDs because there were no substantive changes or differences between the summary exhibits used by Isaacs and the summary exhibits admitted into evidence.

On April 24, 2008, the jury returned a guilty verdict against Isaacs. He was found guilty of knowingly, and with intent to defraud, using unauthorized access devices, namely PrimeCo phone cards, in violation of 18 U.S.C. § 1029(a)(2).

Isaacs filed a motion for a new trial on May 23, 2008. In that motion, Isaacs argued that the district court erred when it failed to grant his motion to continue the trial for thirty days after the government tendered voluminous computer records containing West Interactive and PrimeCo data on the day of trial. Isaacs further moved for a new trial on the basis that the district court improperly limited his cross-examination of Toepfer regarding the level of security of the P2K database or system.

On July 17, 2008, the district court denied Isaacs's motion. In denying the motion, the district court found that Isaacs had possession of the underlying data and summary exhibits long before the trial began in this case. The district court further held that Isaacs had been allowed to question Toepfer about the integrity or security of the database she created, including whether the P2K system was accessible by other employees at the customer service level.

The district court entered judgment against Isaacs on July 18, 2008. He was sentenced to forty months in prison and ordered to pay $573,400 in restitution. Isaacs now appeals.

## II.

### A.

Isaacs's first argument on appeal is that the district court abused its discretion in denying his motion to continue the trial for thirty days. We will reverse a district court's "denial of a continuance only for an abuse of discretion and a showing of actual prejudice." *United States v. Farr*, 297 F.3d 651, 655 (7th Cir. 2002) (citing *United States v. Schwensow*, 151 F.3d 650, 656 (7th Cir. 1998)). In deciding whether a district court abused its discretion in denying a continuance, "we bear in mind that 'a trial date once set must be adhered to unless there are compelling reasons for granting a continuance.'" *Id.* (quoting *United States v. Reynolds*, 189 F.3d 521, 527 (7th Cir. 1999)). However, at the same time, a court cannot have a "'myopic insistence upon expeditiousness in the face of a justifiable request for delay.'" *United States v. Robbins*, 197 F.3d 829, 846 (7th Cir. 1999) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

In evaluating a request for a continuance, a district court weighs seven non-exhaustive factors:

> 1) the amount of time available for preparation; 2) the likelihood of prejudice from denial; 3) the defendant's role in shortening the effective preparation

time; 4) the degree of complexity of the case; 5) the availability of discovery from the prosecution; 6) the likelihood a continuance would satisfy the movant's needs; and 7) the inconvenience and burden to the court and its pending case load.

*Farr*, 297 F.3d at 655 (citations omitted). The weight of these factors will vary in any given situation and the district court is in "'the best position to evaluate and assess the circumstances presented by [a party's] request for a continuance.'" *Id.* (quoting *Schwensow*, 151 F.3d at 656). Accordingly, a district court abuses its discretion "only when we can say that the trial judge chose an option that was not within the range of permissible options from which we would expect the trial judge to choose under the given circumstances." *United States v. Depoister*, 116 F.3d 292, 294 (7th Cir. 1997) (citing *Thornton v. Barnes*, 890 F.2d 1380, 1385 (7th Cir. 1989)).

Having reviewed the record, we cannot find that the district court abused its discretion in denying Isaacs's motion to continue the trial. First, Isaacs had enough time to prepare for trial because the new set of CDs contained essentially the same underlying data as that which was previously produced by the government and disclosed to Isaacs in 2006, during the discovery phase of this case. Second, there were no material differences in the underlying data contained on the earlier and new sets of CDs as the government simply redacted extraneous and inadmissible information, and converted one set of data lists from Microsoft Excel to Microsoft Access to make it more readable. The redaction

of the data and reformatting change did not effect the summary exhibits: they remained the same. Notably, Isaacs has failed to make a showing that there were, in fact, any material differences between the two sets of CDs. Therefore, the government's disclosure of the new set of CDs three days before trial did not nullify Isaacs's trial preparation because he had at least fifteen months to review the underlying data and summary exhibits and, by his own admission, he reviewed all of this information long before trial.[3]

Isaacs next asserts that the district court's denial of his motion to continue severely prejudiced his ability to prepare for trial because the summary exhibits constituted the only evidence in the case that the $1,000 statutory requirement had been met; there was no single witness who could testify that he had acquired $1,000 or more of value through the PrimeCo phone card scheme. Isaacs, however, fails to persuade us on this point. Isaacs has no independent basis for challenging the summary exhibits because, as stated, the summary exhibits did not change and were based on the same underlying data contained in both sets of CDs.

---

[3] The record does not state when in 2006 Isaacs received the earlier set of CDs. Because Isaacs's trial began on April 21, 2008, at a minimum, he had at least fifteen months to prepare. This assumes that Isaacs received the underlying data and summary exhibits on December 31, 2006. However, if Isaacs received this same information on January 1, 2006, he would have had about twenty-seven months to prepare for trial.

Isaacs also contends that, he was unable to adequately prepare to cross-examine Toepfer regarding the validity of the summary exhibits as a result of the government's late disclosure of the new set of CDs. To support his contention, Isaacs points out that there was a discrepancy in the versions of the summary exhibits he and Toepfer used during cross-examination, which entailed the transposition of two identical lines or time entries. Isaacs used a version of the summary exhibits that had been produced by the government early in the discovery process; Toepfer used the summary exhibits that she had prepared and had been admitted into evidence.

In reviewing the discrepancy, the district court found there were no substantive changes or differences in the two versions of the summary exhibits. Because Isaacs does not contend that the discrepancy in the versions of the summary exhibits was anything more than the transposition of two identical lines or time entries, he cannot be viewed as being prejudiced in his ability to prepare for trial. The discrepancy was minor and Isaacs had an opportunity to cross-examine Toepfer, using the summary exhibits that were familiar to him, which he had received early in the discovery process. Furthermore, the discrepancy related to minor differences in the summary exhibits and did not involve the underlying data in this case.

Isaacs's additional contentions likewise fail to persuade us that the district court abused its discretion in denying his motion to continue the trial. Isaacs's claim that he diligently prepared for trial actually belies

his contention that he needed a continuance because there were no material differences in the underlying data contained in the two sets of CDs produced by the government and there was no change in the summary exhibits. And Isaacs admitted he had reviewed the underlying data and summary exhibits long before trial. Furthermore, while Isaacs claims that the complexity of this case weighed in favor of the district court granting a continuance, he fails to persuade us on this point because he had a minimum of fifteen months to prepare for trial, which is a sufficient amount of time when considering the evidence in this case. Therefore, a continuance was not warranted on these bases.

Finally, Isaacs maintains that there was no indication that a thirty-day continuance would have substantially inconvenienced the district court, government, or any witness. Isaacs points out that the district court never discussed or make any specific statements regarding any inconvenience to the court or any party in this case. However, as we have stated, "[T]his factor is simply one of many factors that the court may weigh and consider." *United States v. Jones*, 455 F.3d 800, 806 (7th Cir. 2006). The district court did not err in failing to discuss any inconvenience.

We find that the district court acted within its discretion in denying Isaacs's motion to continue the trial for thirty days. Isaacs has failed to show that there were any material differences in the underlying data contained in the new set of CDs he received shortly before trial, so as to cause him any prejudice. *United*

*States v. Vincent*, 416 F.3d 593, 599 (7th Cir. 2005) ("Despite ample time since trial, however, [the defendant] has neither pointed to exculpatory evidence he would have found in the discovery nor proposed additional questions he would have asked the government's witnesses."); *Robbins*, 197 F.3d at 846 (affirming denial of motion to continue where the defendants "did not identify any specific material prejudice they suffered" from the denial). Because the district court did not abuse its discretion in denying Isaacs's motion for a continuance, we affirm on this issue.

**B.**

Isaacs contends that the district court abused its discretion by admitting the summary exhibits into evidence after the government failed to timely produce the new set of CDs as required by Federal Rule of Evidence 1006. We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Rangel*, 350 F.3d 648, 650 (7th Cir. 2003) (citing *United States v. Brown*, 289 F.3d 989, 994 (7th Cir. 2002)).[4]

---

[4] Plain error is the standard that is used "[w]hen a party fails to properly object to the admission of evidence at trial." *Rangel*, 350 F.3d at 650 (citing *United States v. Curtis*, 280 F.3d 798, 801 (7th Cir. 2002)). Here, Isaacs did not technically object to the admission of the underlying data and summary exhibits offered by the government at trial. However, in essence, he previously challenged the admission of this evidence in pretrial motions, including his April 21, 2008, emergency motion

(continued...)

Rule 1006 controls the admission of summary exhibits:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court.

Fed. R. Evid. 1006. Rule 1006 "requires a party seeking to introduce a summary of voluminous records to provide copies of those records to the opposing party at a reasonable time and place." *Rangel*, 350 F.3d at 651. A reasonable time and place "has been understood to be such that the opposing party has adequate time to examine the records to check the accuracy of the summary." *Id.* (citing *Canada Dry Corp. v. Nehi Beverage Co.*, 723 F.2d 512, 523 (7th Cir. 1983)).

Isaacs contends that the government's decision to turn over the new set of CDs containing the underlying data three days before trial violated Rule 1006 because these records were not made available to him at a reasonable time and place. He maintains that the admission of the summary exhibits was prejudicial as it connected

---

[4] (...continued)

to continue the trial. Because the government does not argue that plain error is the applicable standard, we give Isaacs, who represented himself at trial, the benefit of the doubt by using an abuse of discretion standard.

him to the scheme to defraud PrimeCo and quantified the losses in the case. Therefore, Isaacs claims he would not have been convicted if the summary exhibits had not been admitted into evidence.

We find Isaacs's contention that the government violated Rule 1006 without merit. As discussed above, the government produced the earlier set of CDs containing the underlying data used to create the summary exhibits to Isaacs in 2006. Thus, Isaacs had at least fifteen months to review the data and compare it to the summary exhibits to determine if there were any inaccuracies; he does not claim in this appeal that the underlying data or summary exhibits were inaccurate or erroneous. Because the government complied with Rule 1006, the district court properly admitted the summary exhibits into evidence. We, therefore, affirm the district court on this issue.

## C.

Isaacs contends that the district court abused its discretion by limiting his ability to cross-examine Toepfer regarding PrimeCo's P2K database or system. As a general matter, "[l]imitations on cross-examination are reviewed for abuse of discretion when there are no implications of the defendant's Confrontation Clause rights" under the Sixth Amendment. *United States v. Stoecker*, 215 F.3d 788, 790 (7th Cir. 2000). Here, Isaacs does not assert that his rights under the Sixth Amendment's Confrontation Clause are implicated.

Isaacs contends that he was entitled to fully cross-examine Toepfer regarding the P2K system, which was used, in part, to generate the summary exhibits introduced by the government at trial. On cross-examination, Isaacs sought to challenge Toepfer's testimony that the P2K system was secure and the data could not be altered. Isaacs asked Toepfer whether employees were punished for accessing the P2K system: "And if an employee was to go into a section [of the P2K system] that they are not authorized, would that be grounds for them to be terminated?" (R. 253:14-16.) The government, however, objected to the question on the basis of relevancy. In responding to the government's objection, Isaacs stated that he thought his line of questioning was relevant because "during the direct [Toepfer] stated that certain—that some employees were not allowed to go into the P2K system. And that gives the jury the impression that this information is totally secured." (R. 254:1-4.) The district court, in sustaining the government's relevancy objection, stated that Isaacs could only question Toepfer about the integrity of the database she created, used, and described as secure because that was all the government's counsel had questioned her about on direct examination. Therefore, Isaacs contends that he was unable to challenge Toepfer regarding the security and validity of the information in the P2K system because the district court limited his ability to cross-examine her.

We find that the district court did not abuse its discretion in limiting Isaacs's cross-examination of Toepfer. First, Isaacs was mistaken in his belief that Toepfer testified that the P2K system was secure; she did not.

Rather, Toepfer stated that the database she created was maintained so that the data itself could not be altered or changed. She testified that once she imported the data she received from the internal investigation into her database, which included the data from the P2K system, it was stored in a read-only format so that it could not be changed or altered by anyone. Next, Isaacs was able to elicit testimony from Toepfer that certain employees were able to access the P2K system and, if an employee went into a section of the system he or she was prohibited from accessing, that employee could be terminated. James also testified that certain employees had limited access to the P2K system and she was disciplined for improperly accessing the P2K system to deactivate a friend's phone. Therefore, Isaacs was not limited in his cross-examination as to any material point. Because the district court did not abuse its discretion in limiting Isaacs's cross-examination of Toepfer, we affirm on this issue.

## D.

Finally, Isaacs argues that he has presented three clear errors made by the district court which constitute cumulative errors. "Cumulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001) (citations omitted). However, because we hold that the district court did not err as to any of the issues before us, we find Isaacs's contention without merit.

### III.

Because we find that the district court did not abuse its discretion with respect to any of the issues raised by Isaacs, we affirm the judgment of the district court.

AFFIRMED